RB/PKC:MHW
F. #2011R00207

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**M-11-981**

- - - - - - - - - - - - - - -X

TO BE FILED UNDER SEAL

UNITED STATES OF AMERICA

-against-

ADMIR KACAMAKOVIC,

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF AN ARREST WARRANT

(T. 18, U.S.C. §§
242, 1030(a)(2)(B),
1030(c)(2)(A) and
1030(c)(2)(B)(ii))

- - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

WARREN Y. CHIU, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation (FBI), duly appointed according to law and acting as such.

Upon information and belief, there is probable cause to believe that on or about July 5, 2008, within the Eastern District of New York, the defendant ADMIR KACAMAKOVIC, while acting under color of law, did knowingly and willfully deprive an individual of the right secured and protected by the United States Constitution and laws of the United States to be secure in his person and free from unreasonable search and seizure by one acting under color of law, resulting in bodily injury to that individual.

(Title 18, United States Code, Section 242)

2

On or about March 9, 2009, within the Eastern District of New York and elsewhere, the defendant ADMIR KACAMAKOVIC did knowingly and intentionally access a computer without authorization and exceed authorized access to a computer, thereby obtaining information from a department and agency of the United States, to wit: the FBI.

(Title 18, United States Code, Sections 1030(a)(2)(B) and 1030(c)(2)(A))

On or about and between March 18, 2009 and March 23, 2009, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ADMIR KACAMAKOVIC did knowingly and intentionally access a computer without authorization and exceed authorized access to a computer, thereby obtaining information from a department and agency of the United States, to wit: the FBI, in furtherance of a criminal and tortious act in violation of the Constitution and the laws of the United States.

(Title 18, United States Code, Sections 1030(a)(2)(B) and 1030(c)(2)(B)(ii))

The source of your deponent's information and the grounds for his belief are as follows:[1]

---

[1] Because the purpose of this Affidavit is to state only probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware. In addition, when I rely on statements made by others, such statements are set forth in part and in substance unless otherwise indicated.

## Introduction

1. I have been a Special Agent with the FBI for five years and am currently assigned to Squad C-4, which investigates public corruption and civil rights violations. I am working on the investigation described herein, with officers of the Internal Affairs Bureau (IAB) of the New York City Police Department (NYPD). I am familiar with the facts of this case through my interviews of witnesses, review of reports and records, and discussions with other law enforcement officers.

2. As set forth more fully below, the investigation has revealed that the defendant ADMIR KACAMAKOVIC, an NYPD officer, abused his authority and position of trust by perpetrating an unlawful assault and detention of an individual. The investigation has further revealed that the defendant abused his authority and position of trust by improperly accessing a computer database of the FBI, both to impede an investigation into his misconduct and to assist in the commission of a crime.

## Background

I. The FINEST System

3. The FBI maintains the National Crime Information Center (NCIC), a computer database. The FBI is the agency authorized to acquire, collect, classify and preserve identification, criminal identification, crime and other records and to exchange such information with authorized entities,

including state and local law enforcement authorities throughout the United States.

4. New York City maintains an electronic database system (FINEST) that is designed to give users from qualified law enforcement agencies a single point of access to computerized law enforcement information within and beyond New York State. Qualified state and local law enforcement personnel in New York have access to various forms of information maintained in FINEST, including information maintained by the FBI in the NCIC database.

5. The NYPD has a FINEST account, which can be accessed by multiple users. NYPD officers may access the FINEST website solely by using an assigned user identification which consists of a combination of the initials of the officer's first and last name and a six digit NYPD-issued identification number. As part of their academy training, NYPD officers are required to attend a course on the proper use of FINEST and other confidential databases.

6. FINEST database users are warned on the website that "only information that is related to official police department business is to be requested from the system. Arbitrary inquiries of reputed individuals are prohibited." Users are further cautioned that the "[t]erminal is to be operated only by individuals who have been issued an official

password and sign on.  Only the individual signed onto the terminal is authorized to operate the terminal."

II. ADMIR KACAMAKOVIC and His Cousin

7. ADMIR KACAMAKOVIC has been a member of the New York City Police Department since 2004.  He is currently assigned, and in 2008 and 2009, was assigned as a uniformed patrol officer in Brooklyn's 62nd Precinct.

8. In 2008 and 2009, ADMIR KACAMAKOVIC'S "cousin" (hereinafter "defendant's cousin" or "DC") was the owner and manager of a bar located in Brooklyn, New York (hereinafter the "Bar"), within the confines of the 62nd Police Precinct.[2/]  During that same period, the defendant's cousin was the subject of an FBI investigation into his involvement in, among other crimes, narcotics trafficking.

9. On July 6, 2010, the defendant's cousin pleaded guilty before the United States District Court for the District of New Jersey to an information charging conspiracy to distribute cocaine, in violation of Title 21, United States Code, Section 846.  On January 25, 2011, he was sentenced to a term of 108 months' imprisonment.

---

[2] As reflected herein at paragraph 12, KACAMAKOVIC has indicated that the Bar's owner is his cousin.  Further, after the incident described in paragraphs 11- 12, the defendant's cousin, in conversation with the person described herein as John Doe 1, referred to KACAMAKOVIC as his cousin.  Law enforcement has been unable to confirm that there is, in fact, a familial relationship between the purported cousins.

## Probable Cause

I. <u>The July 5, 2008, Civil Rights Violation</u>

10. A review of, among other sources, reports of witness interviews, and my own interviews, indicates the following. On July 5, 2008, at approximately 12:40 a.m., a group of four individuals arrived by car to the front of the Bar with the intention of patronizing that establishment. One of the passengers (hereinafter "John Doe 1") exited the car planning to exchange seats with the driver (hereinafter "John Doe 2"). John Doe 2 was to then go to the Bar with their two female companions, while John Doe 1 would take the car to pick up another companion.

11. Following a brief verbal exchange with a driver seated in an adjacent car, John Doe 1 was about to enter his driver's seat when he heard a male voice order him to "move the fucking car." As John Doe 1 turned in response, the defendant ADMIR KACAMAKOVIC pepper sprayed him in the face. KACAMAKOVIC was on patrol duty, in uniform and accompanied by a uniformed partner.[3] John Doe 2, who was standing nearby, was also pepper sprayed in the face by KACAMAKOVIC. KACAMAKOVIC reiterated his demand that John Doe 1 move the vehicle but John Doe 1 protested that he could not because he was blinded by the spray.

---

[3] JOHN DOE 1 has identified, from a photograph array, the defendant ADMIR KACAMAKOVIC as the police officer who assaulted him with the pepper spray and, as described in para. 12, later handcuffed and detained him.

12. John Doe 1 and John Doe 2 and their companions entered the Bar, where patrons assisted the two men in washing out their eyes. After approximately one-half hour, John Doe 1 exited the Bar and approached KACAMAKOVIC who was still in the area. John Doe 1 protested his treatment to KACAMAKOVIC and asked what he had done to justify being assaulted with the pepper spray. John Doe 1 further told KACAMAKOVIC that he would be "seeing him in court." KACAMAKOVIC responded by handcuffing John Doe 1 behind his back. KACAMAKOVIC then stated that he was going to arrest John Doe 1 and that "no one fucks with my cousin's place."

13. Despite his asserted intent to arrest John Doe 1, shortly after restraining him in handcuffs, KACAMAKOVIC released John Doe 1 and instructed him to leave the area.

14. According to John Doe 1, in addition to temporarily impaired vision, KACAMAKOVIC broke the skin on John Doe 1's wrist with the handcuffs. In September 2011, John Doe 2 showed me an approximately one-half inch scar on his right wrist, which he stated was a remnant of that injury. That scar conforms to the location on the wrist where handcuffs are attached.

II. The March 9, 2009, Unauthorized Computer Access

15. As noted above, the defendant's cousin was the subject of a federal law enforcement investigation in 2008 and 2009. Pursuant to that investigation, two undercover agents

8

(hereinafter "UC 1" and "UC 2") posed as individuals able to provide contraband, including false identification documents.

16. More specifically, the undercover agents represented to the defendant's cousin that they had a source in Virginia who, if given a photograph, name and birth date, could procure an actual Virginia driver's license containing the proffered information.

17. On or about January 7, 2009, UC 1 and UC 2 met with the defendant's cousin. UC 1 wore a concealed recording device. At that meeting, the defendant's cousin supplied UC 2 with a photograph, the name "Benny Tolaj," and a date of birth. UC 2 assured the defendant's cousin that the licenses he could provide would be "real licenses . . . You get pulled over, the guy, the cop will check. It's in there. You're a legitimate person." UC 2 further added that the licenses he could procure would be "for our people. For our friends. Friends that are illegal. Don't have papers. They need something. Eh. . friends that need something to rent a storage locker. Or to check into a hotel. Or to fly to another city and they don't want a trail . . . because they got business."

18. On or about February 11, 2009, during another meeting between the defendant's cousin and the undercover agents that was recorded by a concealed device, UC 1 and UC 2 provided the defendant's cousin with a Virginia driver's license that the

9

FBI obtained from Virginia State authorities, containing the photograph and identification information for "Benny Tolaj." Upon receiving the license the defendant's cousin stated, "I'm going to let my cousin run through it."

    19.  Later during the same meeting the following exchange took place:

    UC 1:  The license, the license for Benny.

    DC:  Yeah, yeah, yeah [unintelligible] myself.

    UC 1:  Let me know. Ehh . . .

    DC:  [unintelligible]. VIP.

    UC 1:  Let me know what your cousin said when he . . .

    DC:  Yeah, absolutely.

    UC 1:  Cause I'm real curious. I mean I'm 99.999% certain, but I'll feel better . . .

    DC:  Absolutely . . .

    UC 2:  [unintelligible]

    UC 1:  But we haven't really had it checked.

    UC 2:  [unintelligible]

    UC 1:  Nah, cause you know what happened?

    UC 2:  What?

    UC 1:  The one guy, he didn't have a cop to check it, but he had eh . . . through the insurance company, through his business. He said he was looking to hire this guy as a driver, can the insurance company check him out to put his name on the insurance. The insurance company came

>           back, well yeah, good, he's got no points
>           on his license.
>
> UC 2:     [unintelligible] ha!

20. I have been informed by members of the NYPD IAB that an audit was performed of the NYPD FINEST account regarding any searches involving inquiries regarding "Benny Tolaj." That audit revealed that an inquiry for Benny Tolaj was performed from a computer terminal located in an NYPD patrol car assigned within the 62nd Precinct on March 9, 2009, at 4:01 a.m. That query included receipt of a report from NCIC that no record for the searched name was found. The inquiry was made under the FINEST password for a patrol officer (hereinafter "PO 1") assigned to that patrol car on that date and at that time. NYPD records further show that the defendant ADMIR KACAMAKOVIC was assigned to that patrol vehicle as PO 1's partner on March 9, 2009.

21. Further, subpoenaed records for cellular telephones subscribed to by the defendant ADMIR KACAMAKOVIC and to the defendant's cousin indicate that there was a call made from KACAMAKOVIC'S cellular phone to the defendant's cousin's cellular phone on March 9, 2009, that began at approximately 3:59 a.m. and ended at 4:00 a.m. - - approximately one minute before the Benny Tolaj inquiry.[4]

---

[4] During a meeting with the two undercover agents on March 9, 2009, at 10:29 p.m., the defendant's cousin asserted that the "Benny Tolaj" name had been searched by an NYPD Special Operations Lieutenant earlier that day. The defendant's cousin

11

22. I have interviewed PO 1, who informed me that in 2009 he was often partnered with the defendant ADMIR KACAMAKOVIC, who PO 1 believes was aware of PO 1's FINEST password since, often while on tour one officer would log into the RMP's computer terminal and the terminal would remain open throughout the entire tour. He has no recollection of having performed a search for the name Benny Tolaj.

III. The March 18, 2009, and March 23, 2009, Unauthorized Computer Access

23. Within days of his July 5, 2008, assault and detention, John Doe 1 filed a formal civilian complaint against the defendant ADMIR KACAMAKOVIC. That complaint was pending in March 2009. Further, John Doe 1 and John Doe 2 filed a civil suit against New York City, based upon KACAMAKOVIC'S behavior on July 5, 2008. On February 4, 2009, John Doe 1 and John Doe 2 gave sworn testimony in that proceeding.

24. An audit by the IAB of the FINEST system revealed that on March 18, 2009, at approximately 11:39 p.m., a query was made for the name of John Doe 1, using the password code for PO 1. That search accessed the NCIC database maintained by the FBI. The audit also revealed that the search was made from a computer terminal located within a car assigned to patrol Brooklyn's 62nd

---

provided the UCs with a business card of this lieutenant. The NYPD audit of the FINEST account found no inquiry for Benny Tolaj on March 9, 2009, other than that described in paragraph 20, above.

12

Precinct, to which ADMIR KACAMAKOVIC was assigned on that date and at that time. Further NYPD records reflect that PO 1 was assigned to a different vehicle and to patrol a different sector of the 62nd Precinct at the time of the search.

25. Similarly, the IAB audit demonstrated that on March 23, 2009, at approximately 11:48 p.m., another FINEST search regarding John Doe 1 was made using PO 1's password. That search, which also accessed the NCIC database, was made from a computer terminal inside a patrol car assigned to the 62nd Precinct to which the defendant ADMIR KACAMAKOVIC was assigned on the date and at the time of the inquiry. NYPD records reflect that at the time of the inquiry, PO 1 was once again not assigned to that patrol car.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued so that the defendant ADMIR KACAMAKOVIC may be dealt with according to law. Your deponent further respectfully requests that this affidavit and any arrest warrant issued be filed under seal.

Warren Y. Chiu
Special Agent
Federal Bureau of Investigation

Sworn to before me this
3rd day of October 2011

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK